FILED

JAN 1 1 2011

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DAYLE M. WILSON,
           Plaintiff,

                               CV 09-6355-PK

                               AMENDED FINDINGS
                               AND
v.                              RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,
           Defendant.

PAPAK, Magistrate Judge:

      Plaintiff Dayle Wilson filed this action December 16, 2009, seeking judicial review of a

final decision of the Commissioner of Social Security denying her application for disability

insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of

the Social Security Act (the "Act"). This court has jurisdiction over Wilson's action pursuant to

42 U.S.C. §§ 405(g) and 1383(c).

      Wilson argues that the Commissioner improperly rejected her testimony and the opinion

Page 1 - AMENDED FINDINGS AND RECOMMENDATION

of her treating physician, and failed to properly assess her residual functional capacity after

completing step three of the five-step sequential process for analyzing a Social Security

claimant's entitlement to benefits. The Commissioner concedes that the ALJ improperly

evaluated Wilson's testimony, the treating physician's opinions, lay witness statements, and

Wilson's residual functional capacity. The Commissioner therefore moves to remand this action

for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g). Thus, the

sole issue before this court is whether to remand the case for further administrative proceedings

or for an award of benefits. I have considered all of the parties' briefs and all of the evidence in

the administrative record. For the reasons set forth below, the Commissioner's decision should

be reversed and remanded for award of benefits.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Social Security Act, a claimant must

demonstrate an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected . . . to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has

established a five-step sequential process for determining whether a claimant has made the

requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4). At the first four steps of the process, the burden of proof is on the

claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See*

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if

any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If

Page 2 - AMENDED FINDINGS AND RECOMMENDATION

the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, some individuals limited by physical impairments to sedentary or light work must be found disabled, depending on their age and vocational education level. 20 C.F.R. § 404, Subpt. P, App. 2. The so-called "grids" contained in Tables 1 and 2 of Appendix 2 to Subpart P of Section 404 set forth the criteria for determining whether such a nondiscretionary finding must be made. In the event the grids do not mandate a

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

Page 4 - AMENDED FINDINGS AND RECOMMENDATION

finding of "disabled," the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner meets his burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the national economy, the claimant is conclusively found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to meet his burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of

Page 5 - AMENDED FINDINGS AND RECOMMENDATION

the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir.

2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's

interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible

[of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.

1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

### BACKGROUND

Plaintiff Dayle Wilson was born May 2, 1953. Tr. 89, 302.[2] She completed high school.

Tr. 62, 321. From April 1988 through February 2002, Wilson worked as a financial aid

counselor for the State Scholarship Commission processing applications for student loans. Tr.

77, 311-313, 317. On December 4, 2006, Wilson filed an application for Title II disability

insurance benefits.[3] Tr. 302-306. In that application, Wilson described her disabling medical

conditions as "Cervical redintrophy[,] chronic neck pain[, and] disc degen[erative] disease[.]"

Tr. 316. She asserted that these conditions first bothered her in 2002 and caused her to

frequently take time off from work and call in sick. Tr. 316. As a result, Wilson's employer

terminated her on February 28, 2002 due to "excessive late attendance." *Id.*

Wilson submitted a questionnaire supporting her application that describes the impact of

her conditions on her daily activities. Wilson's sleep is interrupted by pain and numbness in her

neck, lower back, arms, and hands. Tr. 345. Wilson has difficulty getting dressed, bathing,

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 12.

[3] Wilson previously applied for benefits in October 2002, but after an ALJ hearing, Tr. 19- 57, her application was ultimately denied on January 28, 2005. Tr. 327-328.

grooming, and feeding because of her restricted movement in her arm, hands, and neck. *Id.*
Further, Wilson reported hardly being able to do any house or yard work because of the pain and
difficulty involved in grasping, lifting, standing, and moving around. Tr. 347. Wilson still
drives, but infrequently, because the restricted movement in her neck makes it difficulty for her
to turn and see other cars. *Id.* She estimates that she can walk about 25 yards, but needs to rest
five to 10 minutes before resuming. Tr. 349. At home, Wilson can sit to read or watch television
as long as she changes positions often. Tr. 348. Her limitations, however, prevent her from
engaging in many social activities she used to enjoy, like going to her grandson's sports games.
Tr. 349. Wilson also describes having difficulty concentrating and remembering to take
medicine, and explains that her pain makes her short-tempered and frustrated around other
people. *Id.*

Wilson's mother, Clara Reddon, also provided a statement supporting Wilson's
application. Tr. 336-343. Reddon describes spending two to three hours daily with Wilson. Tr.
336. According to Reddon, Wilson's physical conditions made it difficult for her to dress, bathe,
prepare food, complete household chores, handle money, concentrate on tasks, shop, and walk
more than one block. Tr. 336-341.

The Commissioner denied Wilson's application initially on February, 5, 2007 and again
on reconsideration. Tr. 89, 90, 91, 253-257. A hearing was held before ALJ John F. Madden, Jr.
on August 20, 2009. Tr. 58. The ALJ issued a decision denying Wilson's claim for benefits on
September 11, 2009. Tr. 6-18. The Appeals Council denied Wilson's requested review. Tr. 1-3.
Wilson then filed this action seeking judicial review of the ALJ decision. (Complaint, #2.)

I.    **Medical History**

Although the record contains references to medical treatment as early as 1991, Wilson's

relevant medical history begins in late 2001 with her first complaints of neck pain. On

September 17, 2001, Wilson visited Dr. Edward Reeves, DO, complaining of left neck pain and

ear problems. Tr. 217. She saw Dr. Reeves again in June 2002 without mentioning neck pain.

*Id.* However, in September 2002, Wilson complained to Dr. Reeves of neck and bilateral arm

pain. Tr. 216. An MRI revealed that Wilson suffered a ruptured cervical disc with cord

compression and Dr. Reeves believed that she would need surgery. *Id.* Dr. Reeves referred

Wilson to Dr. Catherine Gallo, a neurosurgeon. *Id.*

In late October 2002, Wilson reported to Dr. Gallo that she suffered severe headaches,

stabbing pain in her neck and shoulders, and numbness down both arms. Tr. 234. Dr. Gallo

diagnosed Wilson with progressive cervical myelopathy secondary to cervical stenosis at C4/5

through C 6/7 and central disk herniation at C5/6. On November 13, 2002, Dr. Gallo performed

a surgery to remove parts of Wilson's herniated disk and fuse several of her cervical vertebrae.

Tr. 240. Follow-up appointments in December 2002 and January 2003 indicated that the surgery

had gone well and reduced Wilson's pain, but that she still had some left shoulder pain that

occasionally radiated into her left arm. Tr. 233. In February 2003, Dr. Reeves filled out

insurance forms indicating that Wilson was "total[ly] disabled" and unable to work at any and all

occupations. Tr. 499. In May 2003, Wilson reported to Dr. Reeves that her neck and arm pain

was stable. Tr. 214. Dr. Reeves continued her on prescriptions for Neurotonic (an

anticonvulsant) and Elavil (a depression medication) and noted that "I don't believe she will be

able to work for another 6 months." *Id.* Dr. Reeves referred Wilson to Dr. Scot Fechtel for

further neurological evaluation of her neck pain. In August, September, October, and December

2003, Dr. Reeves confirmed in insurance forms that Wilson was totally disabled. Tr. 495.

On October 28, 2003, Wilson reported to Dr. Fechtel that even after the surgery she

continued to experience consistent and disabling neck pain, which sometimes went down her

neck into her back and arms. Tr. 179. In addition, Wilson described having hand weakness and

headaches once or twice a week. *Id.* Wilson also reported that she was occasionally using

methamphetamine, but was participating in Chrysalis drug treatment. Tr. 180. Dr. Fechtel

described Wilson as "fully cooperative" and "remarkably candid." *Id.* Dr. Fechtel diagnosed

Wilson with chronic pain syndrome, possibly caused by degenerative joint disease, migraines,

and significant sleep impairment. Tr. 181. Dr. Fechtel opined that all of Wilson's problems

were likely interconnected. *Id.* Dr. Fechtel prescribed Wilson medications for migraine control,

sleep, and neurogenic pain. Tr. 182. In a follow-up visit on March 31, 2004, Wilson reported

continued weekly headaches and some new swelling and pain in her hands, particularly in her left

thumb and right index finger. Tr. 177. Additionally, Dr. Fechtel found some upper cervical

hypertonicity and tender points in Wilson's trapezii and rhomboids. *Id.* Dr. Fechtel performed a

cervical spine manipulation on Wilson that permitted her to move her neck more freely and

reduced her pain symptoms. *Id.*

In addition to seeing Dr. Fechtel, Wilson continued visiting Dr. Reeves and another

provider, Dr. Richard Erpelding. Tr. 155-161. In June 2004, Dr. Reeves again stated on an

insurance form that Wilson was totally disabled. Tr. 493. In August 2004, Dr. Reeves filled out

a questionnaire from Wilson's attorney confirming Wilson's diagnosis based on objective medical findings. Tr. 174. Dr. Reeves also discussed Wilson's capacity to engage in work activities, but rendered self-contradictory opinions. Although Dr. Reeves checked boxes indicating that Wilson was incapable of light work and capable of sedentary work, he also checked a box indicating that Wilson was able to sustain light work on a full-time basis. Tr. 175. In October 2004, Dr. Reeves filled out another insurance form listing Wilson as totally disabled, but suggesting that she might be able to return to partial duties in January 2005. Tr. 492. The next month, however, Dr. Reeves noted for insurance purposes that Wilson's return to even partial duties was "doubtful" and that she remained unable to work at any occupation. Tr. 491. Dr. Reeves issued a similar verification of Wilson's disability in December 2004. Tr. 490. Dr. Reeve's March, June, and August 2005 forms indicated that Wilson's disability was permanent. Tr. 486-489.

In late 2005, Wilson began to experience increasing difficulty with her left thumb and new problems with her right knee, in addition to her existing neck pain and sleep issues. After Dr. Reeves died, Wilson began to visit Dr. Jeffrey as her primary care provider. In her first appointment with Dr. Jeffrey on October 6, 2005, Wilson reported chronic pain in her left thumb, where past x-rays had shown signs of arthritis. Tr. 442. On that date, Dr. Jeffreys stated on an insurance form that Wilson was totally disabled. Tr. 484. A week later, during a follow-up from her intake appointment, Wilson described having trouble sleeping because of her neck and back pain. Tr. 442. On November 3, 2005, Wilson reported continued neck pain at the same level as in the past. Tr. 440. After discussing her application for disability benefits, she and Dr. Jeffrey

agreed that Wilson "would be able to do some work on a part time basis." *Id.* Consistent with that conversation, Dr. Jeffrey indicated on an insurance form that Wilson was unable to work at her previous occupation, but was not totally disabled. Tr. 483.

On November 22, 2005, Wilson visited Dr. Jeffrey after suffering a knee injury a few weeks earlier. Tr. 440. Wilson described experiencing pain when standing or bearing weight on the knee. *Id.* Dr. Jeffrey also noted that Wilson had a history of injury in her right knee and had her knee surgically repaired in 1989 and 1999. *Id.* Examining Wilson's knee, Dr. Jeffrey found tenderness at the joint and "some significant clunking and crepitus evident."[4] *Id.* Dr. Jeffrey noted that Wilson had an injury to her right lateral meniscus and referred her for further evaluation. On December 13, 2005, Dr. Timothy Straub, an orthopedic surgeon, examined x-rays of Wilson's right knee showing "patellar subluxation" and stated that Wilson had "fairly significant tricompartmental chondromalaciac change." Tr. 390. Dr. Straub diagnosed Wilson with effusion along with a probable chondral (cartilage) injury. *Id.* Wilson elected to proceed with conservative treatments including icing and motion exercises. *Id.* On the same day, Wilson visited Dr. Jeffrey for a follow-up, describing continued problems with joint pain in her hand and neck. Tr. 439. Dr. Jeffrey's insurance form from that date differs from the month previous, once again listing Wilson as totally disabled. Tr. 482. On January 6, 2006, Wilson visited Dr. Jeffrey after being in a car accident and reported more soreness and continued neck and upper back pain. *Id.* She also saw Dr. Straub that same day to discuss her knee injury. Wilson reported ongoing pain and swelling that limited her activities and Dr. Straub recommended

---

[4] Crepitus refers to a a crackling, crinkly, or grating feeling or sound under the skin or in the joints.

arthroscopic surgery. Tr. 389.

By May 2006, Wilson's neck pain had not improved and was limiting her ability to sit, stand, lift, push, pull or carry without significant increases in her pain. Tr. 437. Wilson also reported low back pain that was aggravated by bending, twisting and stooping, which Dr. Jeffrey believed was secondary to her degenerative disc disease. *Id.* Dr. Jeffrey again confirmed that Wilson was totally disabled and wrote that the duration of Wilson's disability was "indefinite." Tr. 479. On July 11, 2006, Wilson reported pain and tenderness in her left thumb, but Dr. Jeffrey found no obvious swelling and observed that the thumb had good range of motion. Tr. 435. A month later, on August 8, 2006, Dr. Jeffrey filled out a form for Wilson's insurance company indicating that she was permanently disabled from her previous job description and partially disabled from doing light duty activities. Tr. 478. On August 18, 2006, Wilson returned to Dr. Jeffrey, who noted that Wilson's neck pain continued to limit her activities and found that her left thumb showed tenderness and swelling at the joint. *Id.* Dr. Jeffrey continued to list Wilson as totally disabled, but noted that Wilson "is permanently disabled from the previous job description. She is partially disabled from doing light duty activities." Tr. 478. On October 31, 2006, Wilson reported increased pain in her thumb, although she was not taking her anti-inflamatory pain medications regularly, and Dr. Jeffrey noted "a lot of crepitus with range of motion" in the thumb. Tr. 433. Consequently, Dr. Jeffrey referred Wilson for an orthopedic evaluation. Tr. 433. On November 1, 2006, Dr. Jeffrey again listed Wilson as totally disabled on an insurance form, writing that she was "unable to work." Tr. 477.

On November 14, 2006, Wilson visited Dr. Straub, the orthopedic surgeon. Tr. 386. Wilson reported throbbing and stabbing pain in her thumb, in addition to numbness and tingling

in her arm when lying down. Tr. 386. X-rays showed advanced arthritic change with subluxation, a deterioration from similar x-rays taken in 2004. Tr. 388. Dr. Straub diagnosed Wilson with "severe left thumb CMC arthritis" and recognized that her thumb was "triggering fairly prominently," which interfered with Wilson's hand function. *Id.* Wilson discussed a number of treatment options with Dr. Straub, including icing, anti-inflamatory medications, steroid injections, and surgery. *Id.* Two weeks later, on November 30, 2006, at a follow-up visit with Dr. Jeffrey, Wilson reported that she fell recently, which caused her additional neck and upper back pain. Tr. 432. Dr. Jeffrey also examined Wilson's thumb, which revealed "quite a bit of crepitus." On December 6, 2006, Wilson described worsening upper back, neck, and low back pain, which was not improved much with Diclofenac, an arthritis medication. *Id.* Dr. Jeffrey prescribed Skelaxin, a muscle relaxant. *Id.*

In February 2007, Wilson reported a new symptom, lower back pain radiating down her legs. Tr. 431. Wilson continued experiencing that pain in March 2007. *Id.* Although Wilson gained some relief from Percocet, neither Diclofenac nor Flexeril (a different muscle relaxant) provided much relief, and Wilson stopped taking Diclofenac regularly. *Id.* Dr. Jeffrey opined that Wilson's low back pain was secondary to a lumbar strain. *Id.* In September 2007, Wilson reported pain in her lower back and right hip, which worsened with bending, going up stairs, or sitting. Tr. 475. Dr. Jeffrey examined x-rays, which showed normal alignment, and prescribed Diclofenac and Fexeril. *Id.*

In February 2008, Wilson sought inpatient drug treatment and mental health counseling services in Malheur County, Oregon. In a mental health evaluation, Wilson admitted that she had been addicted to methamphetamine since 2001. Tr. 456. Wilson started using drugs

following the death of her husband in 2000 and the death of her father in 1999. *Id.* She also reported being severely traumatized at age 12 and having mood swings since that age. Tr. 455. Wilson had completed drug treatment previously, but relapsed and now was back for another session. *Id.* As of the assessment on February 25, 2008, Wilson was clean about 60 days and planned on graduating from the treatment program within another 10 days and continuing her mental health treatment when she returned to her home in Lane County, Oregon. Tr. 455.

Wilson's knee pain worsened in 2008. On March 25, 2008, Wilson reported that she had re-injured her left knee while kneeling in December 2007, but that the pain and swelling had mostly resolved until it suddenly returned again recently. Tr. 472. Wilson also reported trouble sleeping and fatigue. *Id.* A physician's assistant drained fluid from Wilson's knee, ordered her to use crutches, and continued her on prescriptions for Seroquel and Zoloft. Tr. 474. Two months later, on May 28, 2008, Wilson visited Dr. Jeffrey complaining of continued swelling in her knee, as well as insomnia, fatigue, and incontinence. Tr. 470. X-rays revealed a moderate narrowing of the medial joint space, mild osteophyic spurring at the joint margins, thickening of the patellar tendon, and joint effusion (a build-up of joint fluid). On June 11, 2008, Dr. Matthew Shapiro examined Wilson's left knee at Dr. Jeffrey's request. Tr. 463-464. Dr. Shapiro diagnosed Wilson with osteoarthritis of both knees, particularly in the patellofemoral joints. Tr. 464. He drained fluid from Wilson's left knee and injected cortisone, which gave Wilson considerable relief. Tr. 461. Dr. Shapiro also described the difficulties in treating Wilson's condition: under Wilson's Oregon Health Plan she was not eligible for physiotherapy; Wilson had trouble tolerating ibuprofen but other non-steroidal anti-inflamatory drugs were unavailable; and Wilson was not interested in surgery. Tr. 464. Finally, Dr. Shapiro opined that arthroscopic

surgery would be a reasonable option for Wilson's left knee and that Wilson would ultimately

need a knee replacement for her right knee because she was already developing a significant

flexion contracture. Tr. 461.

On July 9, 2008, Dr. Jeffery summarized Wilson's medical condition in a letter to

Wilson's attorney. Dr. Jeffrey wrote that Wilson suffers from gastroesophageal reflux disease,

degenerative disc disease, and bilateral osteoarthritis of the knees and has a history of several

surgeries, including a four level cervical fusion in 2002 and right knee surgeries in 1989 and

1999. Tr. 451. Thus, Dr. Jeffery concluded that "Wilson's multiple diagnoses and her surgical

history would severely limit her ability to perform any gainful employment." *Id.* On July 24,

2008, Wilson returned to Dr. Jeffrey complaining of increasing pain in her neck and right

shoulder and numbness in both arms after awakening in the morning. Tr. 465. Dr. Jeffrey

prescribed Vicodin and Cyclobencaprine, a muscle relaxant. In response to a letter from

Wilson's attorney, Dr. Jeffrey also reiterated Wilson's physical limitations and their effect on her

ability to work:

> It is my medical opinion that Ms. Wilson's current diagnoses and physical condition
> would make it unlikely that she could sustain any employment requiring prolonged sitting
> or standing. Additionally she could not do any lifting; bending; squatting; or turning of
> the neck. I do not believe that she is employable.

Tr. 500.

## II.    Hearing Testimony

### A.    Wilson

In her testimony before the ALJ, Wilson's described the daily impacts of her various

medical conditions.   First, she must constantly alternate between sitting and standing because

she cannot do either for more than 15 or 20 minutes before it gets painful. Tr. 66. When sitting, Wilson's back and neck hurt; while standing, her lower back, right hip, and knees bother her. *Id.* Additionally, Wilson still has problems with neck pain, despite her surgery. Tr. 67. For example, it is difficult for her to turn her head and bothers her to have to look up and down after about 30 minutes. *Id.* Moreover, because of her trigger finger and arthritic joint in her left thumb and arthritis in her right hand, Wilson can only use her hands for 15 or 20 minutes before she experiences shooting pains up her arms. Tr. 68-69. After using her hands for that length of time, she must rest for an hour or an hour and a half. Tr. 82. Thus, Wilson is limited in her ability to do keyboarding or housework. Tr. 70. Wilson also has to rest during the day because of her pain, usually coming from her back, hands, and arms. *Id.* When shopping, Wilson limits the length of her trips because she gets tired walking through the store and also purchases fewer items because she has difficulty lifting heavy bags. Tr. 74. Finally, Wilson's migraine headaches, which occur approximately twice per month, require Wilson to stay in bed until the migraine passes. Tr. 72. Even with medication, a migraine will incapacitate Wilson for a day and prevent her from doing things around the house. *Id.*

## B.    Vocational Expert

At the hearing, Vocational Expert (VE) Mark McGowan testified about three different hypothetical individuals. The ALJ apparently modeled the first hypothetical on a physical residual functional capacity assessment of Wilson conducted by a state medical consultant, Tr. 398-405, involving someone limited to lifting 20 pounds occasionally and 10 pounds frequently, standing and walking for about six hours in an eight-hour work day, with no ability to climb ladders, ropes, or scaffolding, no climbing or crawling, only occasional kneeling and crouching,

no overhead reaching or working bilaterally, and only occasional grip, grasping, and turning motions with the left hand. Tr. 77. The VE testified that Wilson's past work as a financial aid counselor was within the hypothetical, as was the occupation of hotel clerk. Tr. 78.

Next, the ALJ effectively constructed a second hypothetical based on the limitations described in her own hearing testimony, including her restrictions on standing, hand use, and her need to rest. Tr. 80. The VE testified that those limitations would preclude any work on a sustained basis. *Id.* Under specific questioning from Wilson's attorney, the VE clarified that lying down for one or two hours to relieve pain would preclude full-time competitive work and that missing two or more days per month for migraine headaches would also preclude sustained competitive employment. Tr. 80-81.

Finally, the VE testified about a third hypothetical focused specifically on an individual with limited use of her hands during work. The VE calculated that based on Wilson's testimony, Wilson could not use her hands for handling and fingering for more than a third of the work day. Tr. 83-84. Thus, Wilson's attorney asked the VE to consider whether there are "sedentary jobs that would accommodate use of hands for only a third of the [day]?" Tr. 82. According to the VE, such an individual could perform the occupation of an information clerk. Tr. 85. Although that occupation was classified in 1986 as sedentary semi-skilled job, the VE suggested that it is an unskilled occupation as performed and does not involve transferrable skills. Tr. 86.

### SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found in his September 11, 2009, opinion that Wilson did not engage in substantial gainful activity at any time following her alleged disability onset date of February 28, 2002. Tr. 11. He

therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Wilson's medical impairments of "degenerative disc disease of the cervical spine s/p fusion, arthritis of the left thumb, and arthritis of the knees bilaterally" were "severe" for purposes of the Act. Tr. 12. Because the combination of impairments was deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Wilson's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 13. The ALJ therefore properly conducted an assessment of Wilson's residual functional capacity. Specifically, the ALJ found that Wilson had:

> the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). [Wilson] is precluded from crawling and from climbing ladders, ropes, and scaffolds. She is limited to no more than occasional crouching and kneeling and no more than frequent stooping, balancing, and climbing of ramps and stairs. [Wilson] is precluded from overhead reaching bilaterally and limited to occasional gripping, grasping, and turning of her left hand. Finally, [Wilson] should avoid even moderate exposure to workplace hazards such as moving machinery and heights.

Tr. 13.

At the fourth step of the five-step process, the ALJ found in light of Wilson's RFC that she was able to perform her past relevant work as a financial aid counselor. Tr. 16.

At the fifth step, in the alternative, the ALJ found in light of Wilson's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that she could perform. Tr. 17. Relying in part on the testimony of an objective vocational expert, the ALJ found that Wilson could perform occupations such as an hotel clerk, which would require similar skills as Wilson's past relevant work. *Id.* Thus, the ALJ

Page 18 - AMENDED FINDINGS AND RECOMMENDATION

concluded that Wilson would experience very little, if any, vocational adjustment with that job. *Id.* Based on the finding that Wilson could have performed jobs existing in significant numbers in the national economy despite the limitations on her ability to perform the full range of light work, the ALJ concluded that she was not disabled as defined in the Act at any time between February 28, 2002 and September 11, 2009. *Id.*

## ANALYSIS

The Commissioner concedes that the ALJ improperly evaluated Wilson's testimony, the treating physician's opinions, lay witness statements, and Wilson's residual functional capacity. The Commissioner, however, argues that this court should not credit this evidence as true and remand for a finding of disability. Rather, the Commissioner suggests that this court should exercise its discretion to decline to apply the "credit-as-true" rule and instead remand the case for further proceedings.

The Commissioner argues that remand for further proceedings is appropriate because there are several outstanding issues that are best resolved at the administrative level. First, the Commissioner contends that since evaluating credibility is an exclusive function of the ALJ, this court should remand for the ALJ to reconsider the credibility of Wilson's testimony, Dr. Jeffrey's opinions, and Wilson's mother's lay witness statement, and weigh that evidence appropriately. Second, the Commissioner suggests that even if this court were to credit the improperly rejected evidence as true, the issues of Wilson's residual functional capacity and the ultimate determination of disability should be reserved only for the ALJ. Finally, the Commissioner seems to argue that the ALJ properly discredited Wilson's testimony because Dr. Jeffrey opined

in November 2005 that Wilson was able to do some part-time work.[5]  None of these arguments

justifies remanding this case for further administrative proceedings.  Accordingly, this case

should be remanded for calculation of benefits.

## I.    Crediting Improperly Rejected Evidence

In *Varney v. Secretary of Health and Human Services (Varney II)*, 859 F.2d 1396,

1398-99, 1401 (9th Cir. 1988), the Ninth Circuit adopted the "credit-as-true" rule, holding that

the Commissioner must accept a claimant's subjective pain testimony if the ALJ fails to articulate

sufficient reasons for refusing to credit it.  *Id.; see Vasquez v. Astrue*, 572 F.3d 586, 593 (9th Cir.

2009).  That holding, however, was specifically limited to cases "where there are no outstanding

issues that must be resolved before a proper disability determination can be made, and where it is

clear from the administrative record that the ALJ would be required to award benefits if the

claimant's excess pain testimony were credited."[6] *Id.* at 1401; *Vasquez*, 572 F.3d at 593.  Since

*Varney II*, the Ninth Circuit has developed a split of authority concerning whether the credit-as-

true rule is mandatory or discretionary under the circumstances described by *Varney II.  Vasquez*,

572 F.3d at 593 (comparing *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), where claimant's

------

[5] Since the Commissioner readily concedes elsewhere in briefing that the ALJ erred in
rejecting Wilson's testimony, I assume the Commissioner did not intend to backtrack from his
own position.  Thus, I interpret this argument instead as a concern about the onset date of
Wilson's alleged disability and address that issue near the end of my analysis.

[6] The Ninth Circuit also applies the credit-as-true rule in circumstances when the
application of the rule would not result in immediate payment of benefits.  *Vasquez*,  572 F.3d at
593.  For example, where the claimant is of advanced age and has already experienced a severe
delay in her application, the court may instruct the ALJ to credit the claimant's symptom
testimony, yet may still remand for determination of whether benefits are due.  572 F.3d at
593–94 (citing *Hammock v. Bowen*, 879 F.2d 498 (9th Cir. 1989)).

testimony must be credited as true, with *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003), where the court had flexibility in applying the credit-as-true rule).

Although I cannot resolve that disharmony, I note that Ninth Circuit decisions after *Connett* decline to endorse that case's flexible approach and instead frame the credit-as-true rule as encouraged, if not altogether mandatory. *See Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). In *Benecke*, the Court stated that "the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.* (citing *Harman v. Apfel*, 211 F.3d 1172, 1174, 1178 (9th Cir. 2000)) (emphasis added). There, the Ninth Circuit also expanded the scope of the credit-as-true rule, crediting both the improperly rejected treating physician's opinion and claimant's pain testimony. *See id.*

Here, I apply the credit-as-true rule as described in *Benecke*, although my analysis would not change even if the rule was completely discretionary, since I would exercise discretion to apply the rule in any case. Thus, I credit all improperly rejected evidence, including Wilson's testimony and statements, Dr. Jeffrey's opinions, and Ms. Reddon's lay witness statement.[7]

---

[7] Even aside from *Benecke*, there is independent authority supporting a district court's ability to credit improperly rejected physician opinions and lay witness statements. *Widmark v. Barnhart*, 454 F.3d 1063, 1069 (9th Cir. 2006) (when an ALJ fails to provide adequate reasons for rejecting a physician's opinion, courts credit that opinion as a matter of law); *Schneider v. Comm'r of Soc. Sec. Admin.*, 223 F.3d 968, 976 (9th Cir. 2000) (crediting improperly rejected lay witness statements).

Consequently, I turn to the other two aspects of the inquiry: whether there are outstanding issues that must be resolved before Wilson's disability determination can be made, and whether it is clear from the record that the ALJ would be required to find Wilson disabled.

Moreover, I do not rely exclusively on the credit-as-true rule, since Wilson's testimony and Dr. Jeffrey's opinions are consistent with an abundance of objective medical evidence in the record demonstrating the existence of several degenerative conditions impairing Wilson's capacity to engage in daily living and vocational activities. MRIs from as early as September 2002 show cervical disk damage that ultimately had to be addressed with a surgery fusing several vertebrae. Numerous doctors confirmed Wilson's diagnosis of degenerative disc disease. X-rays taken in 2005 and 2008 revealed damage in Wilson's right knee, which had been previously operated on twice. In 2008, an orthopedic specialist examined Wilson's knees and diagnosed osteoarthritis. And, on at least two occasions, treating professionals drained fluid from Wilson's swollen knees. Finally, X-rays of Wilson's left thumb in 2006 indicated arthritis, with significant deterioration compared to similar films from 2004. This sampling of objective medical evidence from the record merely confirms that significant weight should be given to the improperly discredited evidence.

## II.      Potential Outstanding Issues

### A.      Credibility Determinations

Although the Commissioner argues that certain credibility determinations remain outstanding, I disagree. Here, the Commissioner concedes that the ALJ failed to adequately

---

evaluate Wilson's testimony, Dr. Jeffrey's opinions, and Ms. Reddon's lay witness statements. As explained above, I credit that evidence as true. Although the Commissioner is generally correct that the ALJ is solely responsible for determining the credibility of testimony at an administrative hearing, *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 599 (9th Cir. 1999), the Commissioner cites no authority suggesting that the ALJ necessarily retains that exclusive power even after a court determines that he *improperly* exercised it originally. In fact, the Ninth Circuit's application of the credit-as-true rule dictates precisely the opposite. Depending on which conflicting Ninth Circuit authority one follows, the district court may, or perhaps must, credit improperly rejected evidence instead of remanding for the ALJ to redo that credibility determination.

### B.     Residual Functional Capacity

In addition, although the ALJ is typically responsible for determining the claimant's residual functional capacity at the administrative level, there is no need to remand for the ALJ to determine Wilson's RFC in this case. In *Benecke*, the central issue before the ALJ was whether the claimant retained the residual functional capacity to perform sedentary or light work. *Benecke*, 379 F.3d at 595. The Ninth Circuit found that the ALJ erred in determining that the claimant possessed such residual functional capacity. *Id.* Then, the Court concluded that because the record "clearly establish[ed]" that the claimant could not perform a sedentary job or any other substantial gainful work existing in the national economy, it was unnecessary to "return the case to the ALJ to make a residual functional capacity determination a second time." *Id.* The Court reasoned that allowing the ALJ to decide the RFC issue again would create an unfair "heads we win; tails, let's play again" system of disability benefits adjudication. *Id.*

Page 23 - AMENDED FINDINGS AND RECOMMENDATION

Similarly, here, the ALJ erred in determining that Wilson had the residual functional capacity to perform light work, including among other things, occasional crouching and kneeling, occasional gripping and grasping with her hands, and frequent stooping, balancing, and climbing of stairs and ramps. In fact, Wilson stated that her pain and restricted movement made lifting, squatting, bending, reaching, handling, sitting, kneeling, and stair climbing difficult, with the most difficulty presented by kneeling and climbing stairs because of her knee condition. Tr. 349. Moreover, Wilson testified that the pain in her hands and arms required long breaks between short periods of use, that she required extended rest breaks to ease the pain in her back, hands, and arms, and that she had to alternate sitting and standing frequently to relieve pain. Indeed, the VE testified that an individual with the limitations described by Wilson could not engage *any* sustained competitive work. Tr. 80-81. Since I credit Wilson's testimony, among other evidence, it is clear that Wilson's residual functional capacity is inadequate even to perform sedentary work, and thus, prevents her from engaging in any substantial gainful employment.[8] Thus, Wilson's residual functional capacity is not an outstanding issue requiring remand for further administrative proceedings.

## III.    Required Disability Finding

Although the ALJ is generally responsible for determining the ultimate question of a claimant's disability, where it is clear that the claimant is entitled to benefits, remand for further

---

[8] It is important to note that although the VE described one sedentary occupation, information clerk, in his testimony, the VE did not establish that Wilson possessed the residual functional capacity to engage in sedentary work. During the hearing, Wilson's attorney asked the VE whether an individual who, like Wilson, was limited to only using her hands for one third of the workday, could still engage in any occupations. The VE testified that such an individual could perform the sedentary job of information clerk. Thus, the VE merely associated one aspect of Wilson's physical limitations with the capacity to perform one sedentary occupation.

administrative proceedings "serves no useful purpose and is unwarranted." *Benecke*, 379 F.3d at

596. This is such a situation. I have already credited Wilson's testimony and statements and Dr.

Jeffrey's opinions concerning Wilson's inability to engage in any employment. Moreover, I note

the VE previously testified that an individual with the limitations Wilson described in her August

20, 2009 testimony (but not those additional limitations identified by Dr. Jeffrey) could not

engage in any full-time competitive employment. It would be useless to remand this case for

further proceedings merely to have the VE opine about a hypothetical individual possessing *all* of

Wilson's identified limitations; the VE already testified that an individual with just a subset of

those limitations would be unable to perform any type of sustained competitive employment. *See*

*Benecke*, 379 F.3d at 595 ("In the unusual case in which it is clear from the record that the

claimant is unable to perform gainful employment in the national economy, even though the

vocational expert did not address the precise work limitations established by the improperly

discredited testimony, remand for an immediate award of benefits is appropriate.") Therefore,

the record clearly requires a finding of disability. Accordingly, this case should be remanded for

a finding of disability as of February 28, 2002, Wilson's alleged onset date of disability.[9]

---

[9] Wilson's disability onset date of February 28, 2002 is proper, even considering Dr. Jeffrey's opinion that Wilson could engage in part-time work in November 2005. Tr. 440. As the Commissioner aptly acknowledges in briefing, the treating physician's opinion is not necessarily conclusive as to the ultimate issue of disability. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F. 3d 595, 600 (9th Cir. 1999). In fact, objective medical evidence, as opposed to a physician's opinion, is the primary element in determining the onset of disability. *See* S.S.R. No. 83-20, 1983 SSR LEXIS 25. Here, the February 28, 2002 onset date advanced by Wilson is consistent with the medical record as a whole, including the objective finding of Wilson's ruptured cervical disc in 2002. *See* S.S.R. No. 83-20 ("[T]he date alleged by the individual should be used if it is consistent with all the evidence available.")

## CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's final decision be reversed and remanded for an award of benefits, provided that all additional eligibility requirements for disability insurance benefits and SSI disability benefits are met. A final judgment should be entered pursuant to sentence four of 42 U.S.C. § 405(g).

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 11th day of January, 2011.

Honorable Paul Papak
United States Magistrate Judge